May it please the Court, my name is Fred Clements and I represent Baldwin County Sheriff Huey Mack and Deputy Matthew Hunady. This Court should reverse the District Court for two reasons. First, Deputy Hunady's use of deadly force was constitutionally reasonable because he had probable cause to believe Victor was armed and a danger to officers first responders and bystanders on the scene. Second, Sheriff Mack as a supervisor cannot be held liable for failure to train because there's no pattern of similar constitutional violations by Baldwin County deputies. Moving to my first point, Deputy Hunady had probable cause to believe Victor posed a threat. This year, this Court has issued two opinions addressing the issue of probable cause in light of the U.S. Supreme Court's opinion in District of Columbia v. Westby where it used a reasonable officer standard for probable cause. And this Court has given the instruction that this probable cause standard does not require conclusive evidence, is not a high of bar, and instead a reviewing court must simply ask whether a reasonable officer could conclude there was a substantial chance of criminal activity. Thus, in this case, the issue is whether a reasonable officer could have concluded that Victor was a danger to the officer and others. The District Court, however, held Deputy Hunady to a much higher standard. In particular, the District Court opinion spends a significant amount of time second-guessing Officer Hunady's tactical decisions at the scene. For example, in the laundry list, the Court criticizes Deputy Hunady for... Well, it seems to me, Counsel, that the District Court judge in its order made a lot of credibility determinations or weighed the evidence, which is inappropriate in a summary judgment motion when you're ruling on a summary judgment. Isn't that correct? Well, yes, Your Honor. Making credibility decisions is certainly incorrect. And the District Court judge went as far as treating its own conclusions on facts as facts in the record. For example, in particular, in the conclusion that Victor was in a Weaver-type shooting stance, the District Court said, well, a reasonable fact finder could find, well, that he wasn't in a shooting stance. Well, whether he was in a Weaver-type shooting stance is a conclusion.  But the facts are, and are shown on video, is Victor was standing with his legs apart, knees bent, arms forward, hands together. At one point, he's behind cover on a door. This is a stance that people, you know, commonly see in television and movies as a shooting stance. But importantly, what the issue wasn't whether a reasonable jury could find those objective facts, you know, as a shooting stance. The key question is whether a reasonable officer using those objective facts could reasonably believe that that was a shooting-type stance. And, I mean, I've listened, I've seen the video, I've listened to 911 calls, and the calls tell the officer that the paramedics think he has a gun, right? Yes, Judge. That is in the 911 recordings. The 911 recordings not only state that he possibly has a gun, but there are several, there are two instances where the first responders are requesting the deputies step it up, you know, which is, you know, shorthand for hurry. And when he arrives, when Deputy Hunnity arrives, they aren't going towards Victor's car. They're all behind cover. Going back to the district court's laundry list, though. He falls for Hunnity for not speaking to bystanders, for not following up with Victor to determine whether he had a weapon. And significantly for not considering non-lethal types of force, such as a taser. And this is significant because either Judge Cassidy doesn't understand how tasers work, or he was viewing this retrospectively with the knowledge that Victor did not possess a weapon. Because in short, fire a taser, there's two probes that go out. If both probes don't connect, it doesn't work. So when they're deployed, one probe can miss. If there's clothing it doesn't attach, it doesn't work. It's known, it's commonly known that individuals who are on drugs or having mental issues are not affected by a taser. Has anyone besides Judge Cassidy, has any court in any case ever suggested that a police officer should try to tase someone who is pointing a gun at them? No judge. Yeah, that seems kind of crazy to me. It seems like the best thing going for the district court's opinion here is the idea that this gentleman was undergoing a health emergency. He's clearly having some kind of mental health problem and that the police officers owe him some different duty because he's undergoing sort of a medical emergency. What do you say about that idea that there's something different that the police need to do when someone has a mental health or physical health problem than that they would otherwise do? Well, I'd start by saying that as courts recognize retrospectively we can always look back at something and decide whether something could have been done better. But this court has consistently held that actually just this year this court specifically held that the Supreme Court has said you cannot in these type of excessive force cases, courts can't criticize and hold officers liable for their tactical decisions on the scene, which I think is what happened at the district court. And to try to apply that to your question is perhaps he was having a mental condition. There's actually no evidence in the record that he was having some kind of mental issue. It's presumed the evidence cited by the district court is the conclusion made by the plaintiff's police practice expert. But this is not a case where, and you have these cases where you have a call that's made and law enforcement gets information that you have an individual who is having a mental crisis. So they already know when they're going in that what they're dealing with, but that was not the call that was made here. No, Your Honor. Looking back at it, perhaps he was. But there was no confirmation such as cases where a husband or a wife is called saying that my spouse, my friend is suffering from a mental condition. Yeah, I guess I think, and I'm trying to just give the district court sort of let's make the best case we can for the district court's opinion here. This is a situation where the police officer could have just left, right? There was no probable cause to arrest this individual. There was no, I mean, sitting in your car after a one-car accident is not a crime, right? So, I mean, everybody could have just left and he would have just stayed in the car and be fine. Well, I mean, I suppose that they could have. It's not really what we ask police officers or first responders to do. Yeah. Well, but I mean, the first responders are trying to get in there to save the guy's life and the police officer shoots him and kills him. So that's my point. They could have just all left and then, you know, his life isn't saved by the first responders, but he's also not killed by the police officer. There's two points there. First is the first responders aren't going to treat him unless they can get to him. And they aren't going to go in there if they think he's armed, which is precisely why they were waiting. This also wasn't a case where they could just leave either. I mean, this is an instance where in many cases police come to someone's house and the individual may be confined to a room in the house. And in an instance like that, especially where they're informed that the caller knows this person, that they're not dangerous, they could. They can walk out of the room. They can leave him there. But this was on a public interstate. You know, it was unknown. This individual, it was unknown what was going on with this individual. You would potentially be leaving an armed individual who has barricaded himself in a car, which is unusual behavior. And meanwhile, you have the public going by on the interstate on a very busy day, which is very clear. So there was a duty for Deputy Hunnity, unlike these instances where you're in someone's home, to protect the public because it was in a very public place. Quickly, moving on to my point before time ends regarding the issue of MAC. The disreported payment latched onto these ordinarily necessary language from COMIC, basically holding that, well, COMIC doesn't require that there be a proof of a pattern of similar constitutional violations. But this court's precedent and COMIC itself realizes that that isn't so simple. In particular, the district court used this information that as many as 1,000 officers involved shootings regarding people with mental illness put the sheriff on notice. This, however, is in direct contrast to this court's case, this court's holding in Wylan v. Palm Beach County Sheriff's Office. In that case, this court held, any alleged shooting outside of the sheriff's office jurisdiction does not establish a pattern of similar constitutional violations for employees of the sheriff's office that would put it on notice that its own training is inadequate. So, what this court held is that it has to be specific to the police entity. In other words, this was going on in Baldwin County for the Baldwin County Sheriff's Office, which makes sense because the necessary training, let's say in Los Angeles, does not necessarily apply to a place like Baldwin County. I see my time is up. You have time remaining for rebuttal. Thank you. Good morning. Good morning, Your Honor. May it please the court. My name is Sam Tenenbaum. I represent Donna Chisezi, Jonathan Victor's mother, who is present today in court with me is Jack Lane, one of my students who has been assisting me on the case. Your Honor, counsel did, in response to what Your Honor asked, he did exactly what I thought was going to happen. He argued the facts. He didn't look at the facts in a light most favorable to the plaintiff. That's the test and summary judgment, as well as all inferences. And that's frankly what the district court did. We're not here talking about an allegation and a pleading. We're not here talking about responses to motions to dismiss. We're talking about a case where discovery has been had. There are depositions. Parties briefed extensively in the district court. And the district judge, there's another piece to this. The district judge went through all that evidence. And what he did carefully and properly, just as this court did in the Teal case when it reversed the finding of a summary judgment, was look at all the facts in a light most favorable to the plaintiff. And determined that summary judgment was inappropriate. And that's what we have here. Now, with respect to the last point counsel made, I was going to argue supervision later, but I might as well cover it right now. In this court's case, a board of county commissioners of Bryan County v. Brown, the court makes it very clear that it's following Canton. And there's a possibility that a single violation of a federal right coming by a shown that a municipality has failed to train its employees to handle recurring situations, presenting an obvious potential for a violation contrary to municipal liability. If there was ever a case, this is it. This is it. Yeah, what would the training, I'm sure you're about to say that, but what is the training that he's supposed to get? Well, first of all, Sheriff Mackett's deposition that they didn't get any training, the general training to everyone in the force and especially to Deputy Hunterty who admitted as much, they didn't get training in dealing with hostage situations, people who are mentally ill, who are having some kind of an episode. And as our expert, who's one of the premier experts in the country in this area, represents and does work for a lot of police departments as well as for plaintiffs in cases. He's not just a one-sided expert. He laid it out very distinctly, carefully, extensively in his report and in his deposition, the types of training. And in fact, Baldwin County had two officers who had received specialized training, and they weren't called to the scene. And one of the reasons we discussed the deposition with Sheriff Mack was, well, it was after 5 o'clock on Friday and they only worked Monday through Friday 9 to 5. Totally inappropriate. And I asked Sheriff Mack, well, don't you have emergencies after 5 o'clock? They had two officers who knew how to deal with these situations. And what's the goal? Let's go back broadly. What's the goal? The goal is to de-escalate the situation. That's the idea. You want Mr. Victor to leave the car alive and leave the scene alive. He was treated like he was an armed criminal. This case is the farthest from that point. Your Honor made the point, it's one that I have in my notes. Why didn't they just leave him alone? He specifically said, leave me alone, when there was an offer of help. Could have said, Deputy Hunter, he arrives. He does an investigation, which he did not do, and I'll get into that in a moment. If he would have, if he would have found out, he said he wanted to be left alone. Deputy Hunter, he could have said, you know what, guys, pack it up. Let's get out of here. He can call the motor company when he's ready to leave. It's not a danger to anybody. And Judge, with all due respect, the only person who used the term gun was Deputy Hunnity. After he got to the scene, people all called it a weapon. Nobody described this weapon. Could have been a knife, a sword, a hatchet, some of the items that were used, or maybe just the scissors. Yeah. So, I mean, if I could just finish this one little point, and then I don't mean to interrupt, but the words that were used were he was possibly reaching for a weapon. That was what the facts were. Deputy Hunnity never questioned or tried to talk to the person who actually saw what was going on in the car. Right. When he got there. So, I guess one issue that I'm having in understanding how to analyze this is that I've seen the video, and if you just look at sort of what happens within five minutes of the shooting, you know, you have someone sitting in a car, the police saying, come out of the car, refusing to do so, and then coming out of the car and, you know, holding, I mean, I guess it was just his fingers, I hate this, but, I mean, sort of doing this at the police, and then walking towards them, refusing to do what they're asking him to do. If you just look at that snippet, I mean, that person is going to get shot every time, right? That's not quite what, at least when I viewed it and when the District Court reviewed the video, we didn't see it. Your glasses may impose some kind of different view than mine. What did you see when you saw the video? I didn't see it that way either. Yeah, what did you see? I didn't see it that way either, and I want to talk about that incident. What we've done is we've compressed it down to the shooting, and we've forgotten about the broader picture. Detective Deputy Hardy is the one that caused this whole thing, step by step, and I'll take you through that in a minute, but let's just talk about the compressed area, okay? What was the rush to get Mr. Victor out of the car? First of all, he was injured. He shouldn't be moving anyway. He responded. It took a little while, but not all that long, to get to Deputy Hardy telling him to get out of the car. He said, get out of the car. I'm here to help you. I'm here to help you. Mr. Victor gets out of the car. Now, we're looking at what Deputy Hardy testified to under oath. He said he got out of the car and was like this the whole way. That's not what the video shows. Not even close. Also, let's think about it this way. In what way is that not what the video shows? Well, because you see his hands are down here. Okay. All right, and they're wrapped a certain way. If his hands were like this, holding a gun, how did he get them wrapped that way so you couldn't even see the gun? Because Deputy Hardy said he didn't see the gun. Didn't he have a blanket? Think about the contortion to hold the gun and then wrap it around you to cover it. Did you have to go through? A reasonable jury could find that. You know what? That might be. That's hard to do. A reasonable jury could find. I guess what my concern here is with this back and forth is that how is this? I don't have a question. Well, go to your second point because I think you've got a better argument is that we don't just look at this snippet. We look at everything leading up to it and surrounding it. So what do you say about that? All right. First of all, there was no rush. Deputy Hardy, 15, 20 minutes to get there after he heard a call. He thought he was there on a welfare check. He was not going to apprehend an armed suspect committing a crime. Your Honor said it best. He wasn't a criminal. He wasn't fleeing the scene. He hadn't threatened anyone with a gun. Nobody said, hey, the guy pointed a gun at me and threatened me. None of those kinds of actions. He was just somebody who had a one-car accident. He shows up on the scene, and we have the full audio. He doesn't. There's the possibility of a weapon. That's his own term. And that's what everybody would say, a weapon. Does he try to find out what kind of weapon? No. Does he say, well, who saw this weapon? I want to talk to that person. Just rudimentary kinds of things that an officer would do because it's a possibility. There's also other possibilities. And the idea is eliminate as many possibilities as you can. He had plenty of time. He only spent 10 minutes total before the shooting occurred. And he had a whole minute to see Mr. Victor. He doesn't do any of that. He's dealing with someone who he's told was acting erratically. Okay, he's been acting erratically. Does he find out how he's acting erratically? What's he doing erratically? No, he doesn't do that. He then tells Mr. Victor to exit the vehicle. I want to help you. Okay. His claim is, right from the get-go, exiting the vehicle. Victor is aggressive toward him and has this shooting position all the way and is nonresponsive. Okay. Let's assume that's correct. Why? Victor starts out 25, 30 feet away from him. Why does he let him go further if he's worried about a gun? He doesn't tell him to stop until Victor's within 6 feet of him, if he's that worried. You've got four other shooters. This relates as well to the Taser issue. Four other shooters, all positioned. None of them thought he was in any harm because none of them fired. The guns. The words he used, he never used the word weapon. Actually, very loudly, I would say almost screaming at Mr. Victor. Right? He never said, drop the weapon. He never said, you have a weapon. He never told him, I'm going to kill you if you don't drop the weapon. No warning. And there's cases on that. We've covered it. The court covered it. Yeah, I mean, usually those warning cases are someone's fleeing or something like that. They're not, you know, I'm pointing a gun at you and I tell you. He's pointing a gun right at him. But he's also telling him, I'm here to help you. At the same time. Right? Just because he's pointing a gun doesn't mean he's planning on using it. And that's why you've got to expand it out. And that's why we have the supervisory liability. Because every one of those steps along the way, as our expert explained, was a step that should have been taken differently. The idea is to calm them down. If you have somebody erratic, you don't scream at them. If you have somebody who may be having some kind of mental crisis, you try to find out as many facts as you can. Within a few minutes, they could have located ownership of his car, local police, find a family member, maybe have a family member call on a cell phone. There's many things you can do. But the whole point of this, you know, we're back and forth about the facts. This is summary judgment. You know, I'm not talking about a trial. And actually, the Teal case provides a little bit of insight in how this works. This court reversed, set it back down. There was a trial. Defendants won that trial. And it's now on appeal back in this court. I could argue faster with your Honor all day long. But the fact of the matter is we're entitled to have the facts looked at in a light most favorable to the plaintiff. And if you do that, which is what the district court did, this case should be affirmed. I want to briefly mention two things I want to say. First, we decided to, this court, the 7th Circuit decision of Flowers, which was also filed in the Fifth Circuit. And what they basically said is, look, if you have a judge who interjects himself through the summary judgment process and believes that the case is dependent on facts, which this case is, he's not really arguing the law. He's arguing the facts. Then we don't even have jurisdiction. That should not be what the appeal is on. The appeal has to be on a pure legal issue, which is what the cases that they try to rely on for reversal of denial of judgment are all pure legal issues. In conclusion, if I can find my conclusion. Your Honors, Jonathan did nothing wrong. He was merely a victim of a one-car accident. And after viewing the tapes many times, listening to all the audio, the most distressing audios to me were those of the dispatchers who said, don't send the police because they'll just shoot him. And he may only be holding his baby blanket. He was holding his backpack that had his cell phone and his ID. He was an unarmed person. He didn't deserve to die. And the reason he died was due to constitutional violations by the defendants. Thank you, Your Honor. Thank you. Thank you. And thank you for the work that Northwestern does. Thank you for your clinic. Your Honors, I have three points on the rebuttal. First, to point out that the majority of opposing counsel's argument was spent second-guessing Deputy Hunteday's decisions on the scene. Second, I did not argue the facts. I argued the district court's application of the facts to the law, which is entirely appropriate for appeal. Third, I want to address the comment that Mr. Victor was treated like a common criminal. I want to point out the fact in the video where Mr. Victor stepped out of the car and was behind the door. Excuse me. The comment was that he was treated like an armed criminal because he was not. Because had it been known that Mr. Victor was armed, if he had stepped out of that car assuming that he was holding a weapon, that he was holding a pistol, and taken that stance behind the door cover, I suspect that officers would have opened fire on him immediately. But they did not. And instead, what unfolded is over the course of 21 seconds, Mr. Victor made his way up the hill, continued coming at the officers toward emergency personnel and toward public users of the interstate. And at a certain point, Deputy Hunnity was left with the choice of taking action or waiting to see what would happen. And this court in Long Beach Lane held, an officer doesn't need to wait until he is attacked physically before determining that he and others are in imminent danger, which is what Deputy Hunnity did. Can I ask you a question about the jurisdiction, the Flowers issue? Do we have jurisdiction? Explain the Flowers issue, please. I believe counsel filed a supplemental briefing in a case called Flowers. Yes, I mean the idea is that, so this is an interlocutory appeal. This is not from a final judgment. So the way we have jurisdiction over this, if we do, is that the collateral order doctrine allows you to raise this separately from the underlying facts of the dispute. So what legal issue is presented by your claim for qualified immunity that we have jurisdiction to review? Well, as in the notice of appeal, there is a court precedent and I believe statutory authority that qualified immunity is available for appeal interlocutory rather than having to wait until trial. And the particular source of that is cited directly in the notice of appeal filed in this case. Thank you. Thank you both. This concludes our sitting for the week in Montgomery. Thank you all for being here.